**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | |
|---|---|
| IN THE MATTER OF THE § | |
| EXTRADITION OF § | |
| § | EP-21-MJ-00792-ATB |
| LUIS ROBERTO § | |
| DOMINGUEZ VILLEGAS § | |

**MEMORANDUM AND ORDER**

On October 27, 2021, the Court held an extradition hearing in the above-styled and numbered cause. Previously, on September 3, 2021, Luis Roberto Dominguez-Villegas ("Dominguez Villegas") filed his Corrected Motion to Terminate Extradition Proceedings and for CAT Relief ("Dominguez Villegas's Motion"). (ECF No. 31). This Court has authority to determine this matter pursuant to 18 U.S.C. § 3184 and Local Rule 1(a)(3) for the Assignment of Duties to United States Magistrate Judges (Appendix C to the Local Rules). The Court has personal jurisdiction over Dominguez Villegas, who was found and arrested on July 2, 2021, in this District (ECF No. 7) pursuant to a Complaint filed by the United States in response to the request of the Government of the United Mexican States for his arrest and extradition (ECF No. 3).

For the reasons set forth below, **IT IS HEREBY ORDERED** that the Dominguez Villegas's Corrected Motion to Terminate Extradition Proceedings and for CAT Relief be **DENIED**, and that the extradition of Luis Roberto Dominguez-Villegas be **CERTIFIED**.

## I.   BACKGROUND

### a.   Procedural Background

On April 5, 2021, the United States ("Government") filed a complaint for the provisional arrest, with a view toward extradition, of Luis Roberto Dominguez Villegas, a/k/a/ Luis Roberto

1

Isaac Dominguez, a/k/a/ Luis Isaac Dominguez, a/k/a/ Isack Patino, pursuant to the Extradition Treaty Between the United States of America and the United Mexican States, Mex.-U.S., May 4, 1978, 31 U.S.T. 5059; Protocol to the Extradition Treaty Between the United States of America and the United Mexican States of May 4, 1978, Mex.-U.S., Nov. 13, 1997, T.I.A.S. No. 12,897 (collectively "Treaty").  (ECF No. 3).

On September 3, 2021, Dominguez Villegas filed his Corrected Motion to Terminate Extradition Proceedings and for CAT Relief.  After an Order granting the Government's Motion for Extension of Time (ECF Nos. 32, 33) and a subsequent Order granting the Government's opposed Motion to Continue and Extension of Time (ECF Nos. 34, 36), the Government filed their Memorandum of Extradition Law and Response to the Motion to Terminate Extradition Proceedings and for CAT Relief ("Government's Response") on October 20, 2021.  (ECF No. 37). Thereafter, on October 27, 2021, the Court held an extradition hearing pursuant to 18 U.S.C. § 3184 to consider the evidence of criminality that Mexico has presented and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention."  18 U.S.C. § 3184.

      **b.**    **Factual Background[1]**

According to the information provided by the Government of the United Mexican States ("Mexico"), Dominguez Villegas was "charged with Aggravated Murder, in violation of Articles 123, 127, and 136 Sections III and VI of the Criminal Code of the State of Chihuahua."  (ECF No. 3, p. 2).  The charged offense was committed within the jurisdiction of Mexico, and a warrant for Dominguez Villegas's arrest was issued on March 2, 2013, by a judge from the Judicial District of Bravos in Ciudad Juarez, Chihuahua, Mexico.  (*Id.*).

---

[1] While recounting the factual background, the Court addresses only the facts relevant to the immediate Order.

On September 20, 2011, neighbors reported a foul odor coming from 1715 Rubi Street in Ciudad Juarez, Chihuahua, where authorities found the body of Eduardo Mena Saucedo ("victim") with ties wrapped around his neck. (*Id.*). According to the investigation, there was no forced entry into the residence and the perpetrator "had a relationship of trust" with the victim. (*Id.*).

The victim's sister told the authorities that she was in the victim's house after his body was discovered and noticed several items missing, including his cellphone, wallet, and documents related to his 2004 Malibu vehicle. (*Id.*). The victim's sister also told authorities that she noticed social media posts by the victim of photos from a party that occurred at the victim's house on September 16, 2011. (*Id.*). Authorities interviewed one of the guests at the party, who told authorities that he left the party around 11:00 AM the following day, September 17, 2011. (*Id.* at p. 2-3). According to this guest, he invited the victim to go out with him later that day, but the victim told the guest that he was going to see his romantic partner, "Isaac." (*Id.* at p. 3).

The authorities traced the victim's credit cards and found that his SEARS credit card was used on September 18, 19, and 23. (*Id.*). Security camera images from the store at the exact time the victim's credit card was used on September 23, 2011, show that the individual who was using the victim's credit card was wearing a hat branded with the PUMA logo and later hugged a store employee. (*Id.*). Authorities interviewed the store employee, who said that the individual on the security cameras was his ex-romantic partner, "Luis Isaac Dominguez." (*Id.*).

Authorities also recovered the victim's 2004 Malibu, where forensic analysis recovered DNA material from the vehicle that matched the genetic profile of Dominguez Villegas. (*Id.*). After obtaining a search warrant for Dominguez Villegas's residence, authorities found a hat with the PUMA logo that matched the hat used by the individual using the victim's credit card. (*Id.*).

Authorities also found phone records that indicated that the phone had been used on September 17, 2011, in communication with the phone number that belonged to the victim.  (*Id.*).

## II. LEGAL STANDARDS

When there is a treaty for extradition between the United States and a foreign government:

> any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, . . . may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, . . . issue his warrant for the apprehension of the person so charged . . . .

18 U.S.C. § 3184.

After holding an extradition hearing, if the judge "deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention . . . [the judge] shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State . . . ." *Id.* Therefore, "[the court's] role is limited to determining an individual's eligibility to be extradited, which it does by ascertaining *whether a crime is extraditable under the relevant treaty* and *whether probable cause exists to sustain the* charge." *Vo v. Benov*, 447 F.3d 1235, 1245 (9th Cir. 2006); *see also Ordinola v. Hackman*, 478 F.3d 588, 608 (4th Cir. 2007) (Traxler, J., concurring) ("[A] magistrate judge . . . holds a limited 'hearing to determine whether (1) the crime is extraditable; and (2) there is probable cause to sustain the charge.'") (quoting *Prasoprat v. Benov*, 421 F.3d 1009, 1012 (9th Cir. 2005)).  A crime is extraditable if there is a treaty or convention for extradition between the United States and the demanding country which is in full force and effect, and such treaty or convention covers the offense for which the demanding country is seeking extradition.  *Hoxha v. Levi*, 465 F. 3d 554, 562 (3d Cir. 2006) ("A petitioner facing extradition has standing to challenge the validity of the applicable extradition treaty."); 18 U.S.C.

4

§ 3184 ("If, on such hearing, [the judge] deems the evidence sufficient to sustain the *charge under the provisions of the property treaty or convention*, . . . [the judge] shall certify the same . . . to the Secretary of State . . . .") (emphasis added).

In determining whether a treaty covers a particular offense, courts must construe the extradition treaties liberally. *Factor v. Laubenheimer*, 290 U.S. 276, 303 (1933) ("Extradition treaties are to be liberally, not strictly, construed."). Furthermore, "[t]he ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct foreign affairs." *Escobedo v. United States*, 623 F.2d 1098, 1105 (5th Cir. 1980); *see* 18 U.S.C. §§ 3184, 3186. "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F. 3d 103, 110 (1st Cir. 1997).

## III.   ANALYSIS[2]

### a.   The Crime Charged is Covered by a Treaty in Full Force and Effect[3]

In determining whether a charged crime is extraditable, there must be a treaty or convention between the United States and the demanding country which is in full force and effect, and such treaty or convention covers the offense for which the demanding country is seeking extradition.

---

[2] In its Response and at the extradition hearing, the Government relies upon written testimony to support its request for this Court to certify the extradition. (ECF No. 37-1) (Government's Exhibit 1); (ECF No. 37-2) (Government's Exhibit 2A); (ECF No. 37-3) (Government's Exhibit 2B); (ECF No. 37-4) (Government's Exhibit 2C); (ECF No. 37-5) (Government's Exhibit 2D); (ECF No. 37-6) (Government's Exhibit 2E); (ECF No. 37-7) (Government's Exhibit 2F); (ECF No. 37-8) (Government's Exhibit 3); (ECF No. 37-9) (Government's Exhibit 4); *see* 18 U.S.C. § 3190; *see also Glucksman v. Henkel*, 221 U.S. 508, (1911); *In re Extradition of Garcia*, 825 F. Supp. 2d 810, 830 (S.D. Tex. 2011) ("[E]xtradition may be predicated entirely on the 'unsworn statements of absent witnesses.'") (quoting *Collins v. Loisel*, 259 U.S. 309, 317 (1922)). Furthermore, Dominguez Villegas did not object to the admission of any of Government's Exhibits.

[3] The Court notes that at the extradition hearing, Dominguez Villegas agreed with the Government's assertions that the Treaty is in full force and effect and that the offense charged is covered by the Treaty.

Here, the Court finds that the Treaty is in full force and effect between the United States and Mexico. *See* (ECF No. 37-1, p. 1) (declaration of Tom Heinemann, Attorney Adviser in the Office of Legal Adviser for the Department of State, stating "[t]he relevant and applicable treaty provisions in full force and effect between the United States and Mexico are found in [the Treaty]"); *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the department of government particularly charged with their negotiation and enforcement is given great weight.").

Further, the Court finds that the Treaty between the United States and Mexico covers the offense for which Mexico is seeking extradition, namely Aggravated Murder. The Treaty provides, in relevant part, for the return of fugitives charged with, or convicted of, offenses carrying a "penalty of deprivation of liberty for an offense committed within the territory of the requesting party." Treaty art. 1. Further, the Treaty states that extradition shall take place "for willful acts which fall within any of the clauses of the Appendix [to the Treaty] and are punishable in accordance with the laws of both Contracting Parties by deprivation of liberty the maximum of which shall not be less than one year." *Id.* art. 2(1). Specifically, the Appendix to the Treaty expressly provides that murder is an extraditable offense. *Id.* Appendix 1. Accordingly, the Court finds that the crime charged is covered by a treaty in full force and effect, and therefore is an extraditable offense.

      **b.**       **Probable Cause Exists that Dominguez Villegas Committed the Charged Offense**

The standard of proof to find evidence "sufficient to sustain the charge" pursuant to 18 U.S.C. § 3184 is equivalent to the domestic requirement of probable cause. *See Sayne v. Shipley*, 418 F.2d 679, 685 (5th Cir. 1969) ("Hearings held pursuant to Section 3184 are in the nature of a

preliminary hearing. The foreign country does not have to show actual guilt, only probably cause that the fugitive is guilty. The magistrate . . . looks only to see if there is evidence sufficient to show reasonable ground to believe the accused guilty.") (internal citations omitted); *Hoxha*, 465 F.3d at 561 ("The probable cause standard applicable to an extradition hearing is the same as the standard used in federal preliminary hearings."); *Haxhiaj v. Hackman*, 528 F.3d 282, 287 (4th Cir. 2008) ("Section 3184 therefore requires the extradition court to conduct essentially the same preliminary inquiry typically required for issuance of a search warrant or an arrest warrant . . . ."). Probable cause exists if a person of ordinary prudence and caution can believe the accused committed or was committing an offense. *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975); *In re Extradition of Garcia*, 825 F. Supp. 2d 810, 828 (S.D. Tex. 2011); *see also* Treaty art. 3 ("Extradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party . . . to justify the committal for trial."). The probable cause determination is "not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues," but instead "serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based." *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (alteration in original) (internal quotation marks and citation omitted). "In making this determination, courts apply a totality of the circumstances analysis and make a practical, common sense decision whether, given all the circumstances, there is a fair probability that the defendant committed the crime." *Garcia*, 825 F. Supp. 2d at 829 (quoting *In re Rodriguez Ortiz*, 444 F. Supp. 2d 876, 884 (N.D. Ill. 2006))

      The Government has provided the extradition request which includes "a certified statement from the Mexican prosecutor, which discusses and attaches exhibits including the arrest warrant, witness statements, forensic reports, photographs of the victim's body, and surveillance images

from the SEARS." (ECF No. 37, p. 14).  Dominguez Villegas is accused of Aggravated Murder, in violation of "Articles 123, 127, and 136, Sections III and VI of the Criminal Code of the State of Chihuahua, Mexico." (ECF No. 37, p. 2); (ECF No. 37-1, p. 37).

The evidence presented by the Government shows that the Mexican authorities found the victim's body inside his residence on September 20, 2011. (ECF No. 37-1, p. 38).  The victim was found naked, with ties wrapped around his neck, and with a bruise and hematoma to the left parietal region.  (*Id.* at p. 39).  The victim's residence was in disarray, with items lying on the ground and drawers and closet doors open.  (*Id.*).  The autopsy report stated the cause of death was asphyxiation by strangulation and noted that the bruise on the left parietal area was a result of being struck.  (*Id.*).  The crime scene report indicates that the forensic experts concluded by a probability that the victim was surprised and attacked by the aggressor, with the victim having his back towards the aggressor.  (*Id.* at p. 40).  Furthermore, the crime experts also concluded by a probability that the aggressor was on a higher plane and in physical contact with the victim at the time of the aggression.  (*Id.*).  Their conclusion was the victim suffered a violent death, with characteristics that point to a homicide.  (*Id.*).  The investigation also indicated that there was no forced entry into the residence, and that the perpetrator "was someone known to the victim," and therefore, "had a relationship of trust" with the victim.  (ECF No. 37-2, p. 25).

The victim's sister told authorities she noticed several objects missing from the victim's residence following the homicide, including the victim's cell phone, wallet, perfumes, watches, camera, invoice for a white 2004 General Motors Chevrolet Malibu, the Chevy Malibu, and an Acer computer.  (ECF No. 37-1, p. 40).  The victim's sister also reported that she discovered, by reviewing the victim's Facebook posts, that the victim held a dinner party at his residence on September 16, 2011.  (*Id.* at p. 41).

The Mexican authorities contacted the victim's friends who had attended the September 16, 2011, dinner party. (*Id.*). Notably, one guest stated that he left the victim's residence around 11:00 AM on September 17, 2011. (*Id.*). The guest stated that as he was leaving, he invited the victim to accompany him to another party that night, on September 17, 2011. (*Id.*). The guest reported that the victim declined the invitation and stated that he planned to meet "Isaac," his romantic partner, that night. (*Id.*).

SEARS store records confirmed that purchases were made using the victim's SEARS card on September 18, 19, and 23, 2011, between 5:00 PM and 10:00 PM. (*Id.* at p. 41-42). The SEARS store also provided authorities with surveillance recordings from those dates and times. (*Id.* at p. 42). The surveillance recordings show images of the suspect using the victim's SEARS card and hugging a salesman before leaving the store on September 23, 2011. (*Id.*). The authorities were able to interview the salesman, who identified the suspect as "Issac Dominguez" or "Luis Issac Dominguez," whom he had met approximately a year and a half earlier. (ECF No. 37-4, p. 37). The salesman also identified a photograph depicting Dominguez Villegas as the person on the surveillance recordings. (ECF No. 37-1, p. 47). Further, a Mexican police report indicates that this photograph and the SEARS surveillance images match a photo associated with a prior law enforcement record for Luis Roberto Dominguez Villegas. (ECF No. 37-4, p. 37). Moreover, the surveillance images show the suspect wearing a short-sleeved, purple shirt, with two white buttons open at the collar, and a white PUMA brand baseball hat with a black design, which Mexican authorities later matched to the outfit of a Facebook profile photo of the user, "Isack Dominguez." (ECF No. 37-9, p. 18-28).

Further, authorities later recovered the victim's vehicle, which had been missing after his death, and the authorities found that the vehicle contained skin cell samples with Dominguez

9

Villegas's DNA on the driver's side door handle, the steering wheel, the gear shift, and on a Coca-Cola bottle. (ECF No. 37-1, p. 43).

On November 12, 2011, authorities obtained a warrant to search Dominguez Villegas's residence, and upon entering the room that reportedly belonged to Dominguez Villegas, a white PUMA brand cap, with a black design, was found in the closet. (ECF No. 37-1, p. 45). A telephone statement for a phone number belonging to Dominguez Villegas was found, and agents discovered that the phone number had been in contact with the victim's phone number several times on the day of the murder. (*Id.* at p. 45-46).

Based upon their investigation, the Mexican authorities concluded that the victim let Dominguez Villegas into the home and that Dominguez Villegas hit the victim in the head and strangled the victim with cloth ties until the victim was dead. (*Id.* at p. 46).

In sum, by weighing all the evidence before it and in consideration of the arguments by the Parties at the extradition hearing, the Court finds that there is sufficient evidence for a person of ordinary prudence and caution to believe Dominguez Villegas[4] committed the offense charged. Accordingly, the Court finds there is probable cause to sustain the charge under the provisions of the Treaty.

    **c.**    **Petition for CAT Relief Not Ripe**

In Dominguez Villegas's Motion, Dominguez Villegas argues that "[his] extradition would violate the Convention Against Torture (CAT)." (ECF No. 31, p. 14). In the Government's Response and at the extradition hearing, the Government argued that Dominguez Villegas's

---

[4] In addition to this Court's determination as to whether the offense charged is extraditable, the Court determines "whether the person brought before him is the one accused of crime." *Sayne*, 418 F.2d at 685. Here, Dominguez Villegas did not contest the issue of identity at the extradition hearing, filed a Certificate of True Name as "Isack Patino" (ECF No. 13), and signed his affidavit as "Luis Roberto Dominguez Villegas – Isack Patino" (ECF No. 31, p. 25). Therefore, the Court finds that the Luis Roberto Dominguez Villegas arrested in this District for extradition and brought before this Court and the Luis Roberto Dominguez Villegas sought by the authorities in Mexico is one and the same person.

request for CAT relief was not ripe and must first be considered by the Secretary of State. (ECF No. 37, p. 26-27). At the extradition hearing, Dominguez Villegas argued that there is no law preventing the Court from making a CAT finding prior to the Secretary of State's decision on whether to extradite Dominguez Villegas.

On April 18, 1988, the United States signed the Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *opened for signature* Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85. Article 3 of CAT states, in relevant part, that "[n]o State Party shall . . . extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." *Id.* art. 3, 1465 U.N.T.S. at 114.

Here, Dominguez Villegas's position that there is no law preventing the Court from making a CAT finding is misplaced. The Foreign Affairs Reform and Restructuring Act of 1998 ("FARR Act") is legislation by Congress implementing "the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture . . . ." Act of October 21, 1998, Pub. L. No. 105-277, § 2242(a), 112 Stat. 2681, 822 (1998) (codified at 8 U.S.C. § 1231) ("United States Policy with Respect to the Involuntary Return of Person in Danger of Subjection to Torture"). The FARR Act also directs the "heads of the appropriate agencies [to] prescribe regulations to implement the obligations of the United States under Article 3 of the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment . . . ." *Id.* § 2242(b). Notably, the FARR Act states, in relevant part, that "no court shall have jurisdiction to review the regulations adopted to implement

this section, and nothing in this section shall be construed as providing any court jurisdiction to consider or review claims raised under [CAT] or this section, or any other determination made with respect to the application of the policy set forth in subsection (a) . . . ." *Id.* § 2242(d). Furthermore, pursuant to the regulations established because of the FARR Act, it is the Secretary of State who "considers the question of whether a person facing extradition from the U.S. 'is more likely than not' to be tortured in the State requesting extradition when appropriate in making this determination." 22 C.F.R. § 95.2. Therefore, the Court finds it is clear that Congress has passed a law and the proper agencies have passed the relevant regulations that bar this Court from asserting jurisdiction to consider claims for CAT relief when considering extradition certification. Accordingly, the Court declines to consider Dominguez Villegas's claims for CAT relief at this time.

Dominguez Villegas cites to *Nasrallah v. Barr*, 140 S. Ct. 1683 (2020), for the proposition that "[i]f an immigration judge has the authority to grant CAT relief to a non citizen [sic]… a Magistrate Judge has the authority to grant CAT relief to a [sic] an American citizen." (ECF No. 31, p. 16) (ellipses in original). However, since *Nasrallah* dealt with the decision of an immigration judge regarding the final order of removal, *Nasrallah* is not applicable but instead meaningfully distinguishable from the instant case. The FARR Act states, in relevant part, that no court shall have jurisdiction to review claims raised under CAT, "*except* as part of the review of a final order of removal pursuant to section 242 of the Immigration and Nationality Act (8 U.S.C. 1252)." United States Policy with Respect to the Involuntary Return of Person in Danger of Subjection to Torture § 2242(d) (emphasis added). Therefore, the Court finds *Nasrallah* is distinguishable from the instant case since there is explicit language prohibiting a magistrate judge from having jurisdiction to consider claims raised under CAT. Accordingly, the Court finds

Dominguez Villegas's arguments unpersuasive and finds that Dominguez Villegas's CAT claims are premature.  *See Munaf v. Geren*, 553 U.S. 674, 700 (2008) (holding that allegations of torture in a foreign country should "be addressed by the political branches, not the Judiciary"); *Escobedo v. U.S.*, 623 F.2d 1098, 1107 (5th Cir. 1980) ("[T]he degree of risk to [the fugitive's] life from extradition is an issue that properly falls within the exclusive purview of the executive branch.") (citation omitted); *Kin-Hong*, 110 F.3d at 110 ("Under the rule of non-inquiry, courts refrain from investigating the fairness of a requesting nation's justice system, and from inquiring into the procedures or treatment which await a surrendered fugitive in the requesting country." (internal citation omitted)).

> d. ***Amparo* Not Relevant to Current Proceeding**

Dominguez Villegas argues that "the extradition proceedings originating in Mexico have been halted by a writ of "**Amparo**" against the Mexican government's request for Dominguez Villegas's extradition[, and that a]s per Mexican law as of this writing Mexico is no longer requesting Dominguez Villegas's extradition."  (ECF No. 31, p. 6) (emphasis in original).  In Response, the Government argues that "[t]he mere pendency of an *amparo* proceeding . . . has no effect on an extradition request from Mexico under the Treaty."  (ECF No. 37, p. 20) (citing *In re Extradition of Mathison*, 974 F. Supp. 2d 1296, 1310 (D. Ore. 2013) (certifying fugitive as extraditable despite a pending *amparo* challenging the Mexican warrant underlying the extradition request)).

Under Mexican law, an *amparo* proceeding is a collateral means to "review and annul unconstitutional judicial decisions."  *U.S. v. Fowlie*, 24 F.3d 1059, 1064 (9th Cir. 1994).  The procedure most analogous to an *amparo* in the United States is a petition for a writ of habeas corpus.  *See Fowlie*, 24 F.3d at 1065 ("Like *habeas corpus*, the *amparo* has a more limited scope

13

than an appeal and determines whether the contested act violated a petitioner's *constitutional* rights." (emphasis in original)).

There are three possible outcomes to an *amparo* challenge: (1) "denial, i.e., the authority's act stands and has its purported effects;" (2) "full amparo protection ("amparo liso y llano"), i.e., the impugned act of authority is quashed and has no effect whatsoever;" and (3) "amparo for amendments ("amparo para efectos"), i.e., the authority's impugned act must be reformulated . . . to amend or defend the legal grounds used, . . . to amend or further explain the motivation for the corresponding act, and/or . . . to correct a procedural error and properly execute it." Rodrigo Labardini, *Life Imprisonment and Extradition: Historical Development, International Context, and the Current Situation in Mexico and the U.S.*, 11 S.W.J.L. & Trade Am. 1, 47-48 (Winter 2005). Further "[i]n the case of an amparo para efectos, the impugned act is suspended, but not quashed, and it will not have any of its effects until it has been adequately amended, complemented and/or corrected by the issuing authority." *Id.* at 48.

At the extradition hearing, the Government argued that the *amparo* has been denied, while Dominguez Villegas argued that the *amparo* for amendments ("*amparo para efectos*") has been issued. Both Parties relied upon their own conversations with different Mexican officials but stated that they did not have written documentation of these alleged decisions. However, Government's Exhibit 3, Diplomatic Note number 04256, corroborates the Government's position that "the *amparo* judge dismissed the case on September 10, 2021" and "the judge hearing the criminal case brought against the accused has not determined the dismissal of the arrest warrant at any time, so the arrest warrant for which the extradition proceedings against the accused is based is still valid and enforceable." (ECF No. 37-8, p. 4).

14

Regardless of the true status of the *amparo* proceeding, this Court finds it improper to review Dominguez Villegas's *amparo* proceedings, and finds it is no bar to a determination that Dominguez Villegas is extraditable. *See, e.g.*, *Mathison*, 974 F. Supp. 2d at 1310 (certifying fugitive as extraditable despite a pending *amparo* challenging the Mexican warrant underlying the extradition request); *In re Extradition of Salazar*, No. 09MJ2545-BLM, 2010 WL 2925444, at *16 (S.D. Cal. July 23, 2010) (certifying fugitive as extraditable, despite a pending *amparo* proceedings in which he was challenging the warrant submitted in support of Mexico's request for his extradition). "U.S. courts are strongly discouraged from reviewing whether the demanding country has complied with its own law and, indeed, it is error to do so except to the limited extent necessary to ensure compliance with the applicable extradition treaty." *Skaftouros v. U.S.*, 667 F.3d 144, 156 (2d Cir. 2011); *see also Mathison*, 974 F. Supp. 2d at 1310 ("An American extradition court is neither equipped nor empowered to interpret and apply the Mexican Constitution or to determine what rights it bestows upon individuals charged with violating Mexican criminal laws."). Therefore, the Court here finds that the *amparo* litigation does not affect Dominguez Villegas's extradition. *See In re Assarsson*, 635 F.2d 1237, 1244 (7th Cir. 1980), *cert. denied*, 451 U.S. 938 (1981) ("[T]he narrow scope of review [in extradition proceedings] is based on respect for the sovereignty of other nations. While our courts should guarantee that all persons on our soil receive due process under our laws, that power does not extend to overseeing the criminal justice system of other countries."). Without clear evidence that the arrest warrant or extradition request are no longer valid or enforceable, the Court finds it is improper to further inquire into the legal implications of a foreign legal proceeding.

## IV.   CONCLUSION

In sum, the Court finds that the offense charged is covered by the applicable extradition Treaty that is in full force and effect, and thereby extraditable, and that the evidence submitted by Mexico and the Government is sufficient to establish probable cause to sustain the charge of Aggravated Murder.  Furthermore, the Court finds that all of the submitted documents are properly certified and authenticated and are admitted into evidence.  The Court also finds Dominguez Villegas's claims for CAT relief to be premature.  Finally, the Court finds that the current *amparo* proceedings in Mexico are not relevant as to whether the Court should certify Dominguez Villegas's extradition.

Accordingly, the Court **HEREBY ORDERS** the following:

- Dominguez Villegas's Corrected Motion to Terminate Extradition Proceedings and for CAT Relief is **DENIED**;

- The Court **GRANTS** the request for extradition and **CERTIFIES** to the Secretary of State, pursuant to Title 18, United States Code, Section 3184, all of the submitted documents and evidence, including this Court's finding that Luis Roberto Dominguez Villegas is extraditable to Mexico for the charged crime of Aggravated Murder; and

- Luis Robert Dominguez Villegas **SHALL REMAIN** in the custody of the United States Marshal and confined in a proper facility until surrender is made to a duly qualified agent of the United Mexican States, or until further order from this Court or from the Secretary of State;

- The Court **DIRECTS** the District Clerk to deliver a copy of this Memorandum and Order, together with all formal extradition documents received into evidence, all evidence taken at the hearings including transcripts of the proceedings, all memoranda of law filed on the

issue of extradition, and all orders of court via certified mail (return receipt) to: U.S. Department of State, Secretary of State Antony J. Blinken, 2201 C Street NW, Washington, D.C. 20520.

**SIGNED** and **ENTERED** this 29th day of October, 2021.

_____
**ANNE T. BERTON**
**UNITED STATES MAGISTRATE JUDGE**